**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**NORMA ANN SUMMERVILLE,**

       **Plaintiff,**

    **v.**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

**Civil Action 2:14-cv-984**
**Judge Algenon L. Marbley**
**Magistrate Judge Elizabeth P. Deavers**

## REPORT AND RECOMMENDATION

Plaintiff Norma Ann Summerville brings this action under 42 U.S.C. §§ 405(g) and 1383(c) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for social security disability insurance benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 10), the Commissioner's Memorandum in Opposition (ECF No. 13), Plaintiff's Reply (ECF No. 14), and the administrative record (ECF No. 9). For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.     BACKGROUND

Plaintiff filed her application for disability insurance benefits on November 10, 2011. She initially alleged that she has been disabled since April 1, 2010, at age 51, as a result of spinal stenosis, degenerative joint disease, and asthma. (R. 78; *see* R. 45 (birthdate of September 24, 1958)). Because Plaintiff had previously been awarded benefits for the closed period between

April 1, 2010 through July 6, 2011 (R. 67-77), she amended her alleged onset date to July 7, 2011 (R. 262). Plaintiff's application was denied initially and upon reconsideration.  She sought a *de novo* hearing before an administrative law judge ("ALJ"). ALJ Sandra R. DiMaggio Wallis held a hearing on March 22, 2013, at which Plaintiff, represented by counsel, appeared and testified. (R. 39, 45-57.) Edward J. Utities, a vocational expert, also appeared and testified at the hearing. (R. 58-64.) On May 1, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act. (R. 19.) On June 24, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision. (R. 1.) Plaintiff then timely commenced the instant action.

## II.     HEARING TESTIMONY

### A.     Plaintiff's Testimony

Plaintiff testified at the administrative hearing that she has an Associate's Degree in Business Management and last worked in July through October of 2011, forty hours per week, doing clerical work. (R. 45-46.)

When asked why she is unable to continue working full time, she testified:

> I still have pain in the back. I have pain that goes down the leg sometimes. My legs ache like toothaches. I have headaches. My neck bothers me a good bit . . . trying to turn so far. And sitting . . . I have to lay sometimes in different positions in order to get comfortable. It's just been my daily routine right now.

(R. 48.) According to Plaintiff, she realized she could not continue to do her job because the filing required reaching up, stooping, getting in and out of her chair constantly, and staring at her computer screen constantly. She stated: "I'd just come home every night in severe pain. I

couldn't hardly walk my legs hurt so bad. And I just finally told my husband, 'I can't do it,' so in October I quit." (R. 52.)

She testified that she has headaches "[a]bout every day," and that, if she "lay[s] down in a certain position where [she] get[s] comfortable, [she] can relax and the pain eases to where it's tolerable." (R. 48.) She also uses a heating pad or an ice pack to relieve pain; for shooting or stabbing pain, she uses a heating pad and lies down with her legs elevated to take the pressure off her tailbone and reduce leg pain. (R. 54.) The medication she is taking has side effects, and she is "trying to get off of it." (R. 48.) Because other medication made her nauseated, she is "down to just taking regular [over the counter] Tylenol." (R. 49.) She stated that she "started a week ago taking [herself] off the pain medication," at the suggestion of her doctors. (*Id.*)

When asked about her physical limitations, she estimated that she could lift ten pounds, stand for about five minutes at a time, and sit for about one half hour to one hour at a time, depending on the seating. (R. 49.) She lies down at least three to four times per day for about one half hour to one hour, and she can occasionally climb stairs or steps. (R. 49-50.) She is able to independently take a shower or bath, get dressed, and comb her hair, although "it just takes [her] a while." She cooks and cleans, does "[l]ight, light cleaning," and she shops, although she stated that it "takes [her] all day." (R. 50.) To pass the time, she watches television, talks on the phone to friends, gets on the internet, and reads books. (R. 51.)

She testified that she takes medication for depression, but she does not get counseling or therapy, and her depression does not cause symptoms that would keep her from working. (R. 50.)

Plaintiff has been seeing Dr. Dunmyer for about ten years, going about every three months. (R. 54.) She testified that she had not seen Dr. Shannon since June or July of the

3

previous year because she was not able to afford the $150 cost of an office visit. (R. 51.) She has had to change the way she does chores, it takes her longer to do them, and she has days when she is not able to do any chores. (R. 51-52.)

Plaintiff also testified that she has median arcuate ligament syndrome, which causes severe abdominal pain and for which she had surgery. (R. 53.) She stated that "[i]t's starting to get a little bit better, but [she] still has some issues" including stomach pain if she eats too much or if she takes her medication in the morning. This is why she had decided to stop the pain medication. (*Id.*)

###    B.    Vocational Expert Testimony

Edward J. Utities testified as the vocational expert ("VE") at the administrative hearing. The VE testified that Plaintiff's past jobs include working as a Small Products Assembler, a Data Entry operator, a Maintenance Worker, and a General Clerk. (R. 58.)

The ALJ proposed a hypothetical regarding Plaintiff's residual functional capacity ("RFC") to the VE. Based on the RFC ultimately determined by the ALJ[1] and Plaintiff's age, education, and work experience, the VE testified that Plaintiff could perform her past relevant work as Data Entry Operator and General Clerk, but she could not perform her other past work. (R. 59.) The VE also testified the she could perform approximately 28,000 jobs in the regional economy such as a Receptionist, Appointment Clerk, and Credit Card Clerk. (R. 59-60.)

The VE's answers did not change in response to the following changes: The hypothetical person could lift, carry, push, or pull only up to ten pounds occasionally or frequently; could

---

[1] In response to the VE's question, the ALJ clarified that the ability to reach referred to reaching "basically at desk level, ten to sixteen inches." (R. 59.)

stand or walk only two hours in an eight-hour workday; must change positions every hour; could never reach in front or overhead with either upper extremity; and can frequently finger and handle with both of her extremities. (R. 60-61.)

The VE also testified that, while one vacation or sick day per month can be reasonably expected, the need to miss more than two days each month would preclude all employment. (R. 62.)

When examined by Plaintiff's counsel, the VE testified that he did not know of any employers who would tolerate an employee's need to take additional 15-20 minute breaks throughout the workday, in addition to the normal lunch break and two 15-20 minute breaks per day. (R. 63-64.) He testified that additional occasional breaks of four to five minutes each would not preclude working in general, however. (*Id.*)

## III.  MEDICAL RECORDS

In her Statement of Errors, Plaintiff does not challenge the Commissioner's findings with respect to her alleged mental impairments. Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged exertional impairments.

### A.    Dr. Michael B. Shannon, M.D.[2]

Plaintiff has seen Dr. Michael B. Shannon, M.D. regularly for her back pain since March 1991. (*See* R. 269, 279.)

On June 14, 2010, Dr. Shannon noted that Plaintiff "still has chronic neck pain. She does get relief with the use of RELAFEN, VICODIN, and FLEXERIL. Her major complaint is the

---

[2] Because certain records from Genesis Healthcare System pertain to surgeries and radiology examinations performed or ordered by Dr. Shannon, these records are considered together with Dr. Shannon's treatment notes.

5

lower back pain." He noted that "she has tenderness with good strength, sensation and reflexes of the lumbar region but positive straight leg raising to about 30 degrees." He noted that "she is off work right now for the past three months and that really has not seemed to help." (R. 281.)

Other treatment notes also dated June 14, 2010, but initialed after the foregoing notes, state that Plaintiff's "neck is doing well and [Plaintiff] still has some discomfort and pain in her lower back. She works and does some lifting, which she seems to be doing pretty well with that." (R. 280.)

On August 31, 2010, Dr. Shannon reported to Dr. Shelly Dunmyer, M.D., Plaintiff's primary care physician (*see* R. 267), that Plaintiff:

> Has developed in the past several months increasing pain in her back and going into both of her legs and it is difficult to for her walk and stand, and do any kind of activity. She has been on medication and restricted activity but this has not helped. She underwent an MRI of the thoracic lumbar region and thoracically she has some central protrusion at the C7-8 without cord compression and the lumbar region she has significant stenosis at L4-5. . . . She has had previous anterior cervical discectomy, interbody fusion and plating at C5-6 on 08/10/06.

(R. 279.) His impressions included lumbar spinal stenosis, L4-5; lumbar radiculopathy bilateral left greater than the right; status post anterior cervical discectomy, fusion and plating C5-6 in 06; and asthma and COPD. He recommended decompressive laminectomy. (*Id.*)

On September 16, 2010, Dr. Shannon performed a "wide decompressive laminectomy and total hemilaminectomy of L4 and partial of L5 and going across the midline." (R. 268-70, 383.) He noted in the operative report that Plaintiff:

> in . . . 1991, developed some cervical radiculopathy and subsequently underwent an anterior cervical discectomy, fusion, and plating on 08/10/06. She had developed some difficulty with

6

> her back going into both legs and despite rest, medication, and
> therapy there was no improvement. The pain in her left leg as time
> went on became intractable. She had an MRI, which revealed her
> lumbar spinal stenosis at L4-5 central and more on the left than the
> right. . . .

(R. 269.) He also noted that he found "[s]evere bony stenosis with nerve root compression in the

proximal foramen," but "[n]o evidence of disk herniation." (R. 270.)

On October 15, 2010, Dr. Shannon noted that Plaintiff "still has some numbness in her

foot, but she is getting around a little bit better, she uses a walker for this. There doesn't seem to

be much in the way of any pain like she had before." He found that she had "good strength and

reflex" and prescribed back exercises. (R. 277.)

On December 10, 2010, Dr. Shannon noted that Plaintiff "still has some hip pain on the

left side but all in all she is getting around well . . . with the use of a walking cane." (R. 276.)

On June 7, 2011, Dr. Shannon noted that "most of [Plaintiff's] pain is in the left side now

along with hip pain on the right. She has been taking RELAFEN and VICODIN ES without

much relief." (R. 276.) He noted that "she has depressed to absent deep tendon reflexes and good

strength and sensation." (*Id.*) He ordered an x-rays to look at her hips and pelvis. (*Id.*) The

imaging report, also dated June 7, 2011, found "[n]o acute osseous abnormality of the pelvis or

bilateral hips," noting that "[t]he included lower lumbar spine is unremarkable. (R. 267.) No

acute pelvic fracture. Sl joints are unremarkable. No acute fracture or dislocation of either hip

joint. No significant hip joint narrowing. No evidence of avascular necrosis." (*Id.*)

On December 2, 2011, Dr. Shannon noted that Plaintiff "continues to have pain in her

back particularly in the right side." On exam, he found "right paraspinal muscle spasm, good

strength, sensation and reflexes and she is able to walk to heels and toes." (R. 275.)

On June 8, 2012, Dr. Shannon noted that Plaintiff continued to have "some pain in her back and in her right hip and is not quite as bad." (R. 380, 542.) "Neurologically, she had good strength and sensation but her patellar reflexes are absent, she has limited flexion to only about 10 degrees." (R. 380.)

On June 13, 2012, an MRI was stable compared to the August 9, 2010 MRI, except that "[a]nterolisthesis at L4 on L5 is slightly more conspicuous," and "[c]entral canal and lateral recess stenosis has improved." (R. 381-82.)

On October 8, 2013, Dr. Shannon reported to Dr. Dunmyer that Plaintiff "has once again [begun] in the last couple of months having pain in her neck and no radiation into her arm." While an MRI showed "mild stenosis with no cord compression at C3-4," a Medrol Dosepak did not provide relief. "On exam . . . she has a little tenderness in her neck and there is no paraspinal muscle spasm, fairly good range of motion but she has good strength, sensation and reflexes." (R. 541.)

On January 29, 2014, Dr. Shannon noted:

> [Plaintiff] is now having pain in her neck and going across her shoulder and a lot of numbness and tingling in her hands, also in her back and in her legs. We had just done an MRI of her cervical spine back on 9/24/13 and this showed C3-4 spondylotic protrusion and a little flattening of the hemi-cord, and some disc protrusion at the C4-5 but beautiful fusion at C5-6. Her lumbar was done the year before that 2012, showing a laminectomy at the L4-5 on the left anteriorthesis at C4-5. She had disc protrusion at C3-4 as well.
>
> On exam, today, she has tenderness in her neck with limited range of motion of and ten degrees on either side and she has a little bit of decrease in her hand grips with absent biceps reflex, triceps brachial radialus, are present. She has tenderness in her lumbar region, but good strength and reflexes as well. Because of these

> new recent symptoms and such severe pain in her neck, we are
> going to get repeat MRI of the cervical spine to review the stenosis
> I saw at C3 with hemicord effacement. . . . [Plaintiff] has had no
> response to steroids or muscle relaxants.

(R. 13.) The same day, Dr. Shannon reported to Dr. Shelly Dunmyer, M.D. that he had seen

Plaintiff in follow-up and "did a repeat MRI showing a hygrade stenosis C3-4 with spinal cord

compression," noting that Plaintiff "is going to need surgery." (R. 10.)

On February 11, 2014, Dr. Shannon performed an anterior cerical discectomy, interbody

fusion, anterior plating at C3-4 for stenosis. (*See* R. 9.)

On February 17, 2014, he noted:

> Most of [Plaintiff's] pain pre-op was in her right arm and she has
> complained since around Friday three days and this surgery was
> just done 6 days ago. She has complained of significant pain in her
> neck posterior aspect of her left shoulder down the left upper
> extremity not the right. This has gotten to the point that it hurts her
> to lift her shoulder and flex her arm. . . .
>
> On exam . . . she has pain and tenderness upon movement of her
> left shoulder and she is able to grip my hand well and her biceps
> and triceps are a little bit on the weak side because she has
> difficulty with pain in her left shoulder, good strength and reflexes
> in the right upper extremity and both lower extremities. She walks
> with little shuffling gait. All in all I feel that this is some post
> operative anti-inflammatory reaction going on in the spine as well
> as the nerve root . . .

(R. 9.)

On February 19, 2014, Plaintiff was "not doing any better." (R. 10.)

On February 26, 2014, Dr. Shannon noted that Plaintiff was "still is suffering with quite a

bit of pain in her left shoulder and a little bit of trouble abducting actually on exam today, she

has pain on abduction and rotation anteriorly just with me holding her arm. There is more joint pain [than] anything else." (R. 12.) He also noted that she "has good strength in her hands." (*Id.*)

On March 3, 2014, Dr. Shannon noted that Plaintiff:

> still has quite a bit of discomfort and pain in her left shoulder and arm and some of this is mechanical on rotation internal external flexion and there is quite a bit of pain in her shoulder. She is able to raise it above the level of her arm. She has good strength and sensation and still has tenderness in the cervical suprascapular region.

(R. 8.)

On March 10, 2014, Plaintiff reported that she was still having a lot of pain. (R. 11.)

On March 26, 2014, Dr. Shannon noted that:

> following surgery [Plaintiff] had significant reduction in her pain and a lot of pain in the back part of her neck and across her shoulders and into her left shoulder. Gradually, with intermittent steroids, and some anti-inflammatories and NEURONTIN, things have gotten better, she is now at the point that she can lift her arm up abduct it fairly well at 50% now and able to rotate her head back and forth without any trouble. She is going to start to drive again. She has good strength and reflexes are still slightly increased in left upper extremity.

(R. 7.)

### B.     Dr. Shelly L. Dunmyer

The records from Dr. Shelly L. Dunmyer contain the following entries: a visit for fatigue with anxiety on January 12, 2010 (R. 285); follow-up for depression on February 2, 2010 (R. 286); acute sinusitis on July 14, 2010 (R. 287); sinusitis and back pain on August 3, 2010 (R. 288); left leg pain, with concerns of a possible blood clot on October 5, 2010 (R. 289); anxiety, insomnia, asthma, and sinusitis on February 15, 2011 (R. 290, 367); a rash on February 28, 2011

(R. 294, 364); sinusitis on March 29, 2011 (R. 361); bronchitis and sinusitis on December 28, 2011 (R. 294, 357); chest pain, rectal pain, and fatigue on January 27, 2012 (R. 299, 354); chest pain on February 24, 2012 (R. 352); anxiety, insomnia, and fatigue on March 16, 2012 (R. 349); abdominal pain on April 13, 2012 (R. 345); shingles on May 1 and 10, 2012 (R. 337-45); a routine gynecological exam on May 25, 2012 (R. 334); cholesterol on June 11, 2012 (R. 331); fatigue, abdominal pain, and hyperglycemia on August 7, 2012 (R. 391, 401); and abdominal pain on August 20, 2012 (R. 388, 398) and September 11, 2012 (R. 386, 396)

The record also contains results of several tests ordered by Dr. Dunmyer, including the following: a December 22, 2004 head CT showing sinus fluid, but otherwise normal (R. 379); a April 4, 2005 chest x-ray showing no active intrathoracic disease (R. 378); a June 19, 2006 lumbar spine x-ray showing mild degenerative change (R. 376); a June 30, 2006 lumbar MRI showing a mild degree of bulging to the annulus at the L3-4 and L4-5 levels without signs of significant disc herniation or stenosis (R. 375); a March 2, 2012 chest x-ray showing atherosclerotic changes in the thoracic aorta (R. 374); a May 11, 2012 CT scan of Plaintiff's thorax, showing normal results except for subtle thin linear atelectasis in the lingual (R. 329); and normal mammograms in January 2006 and May 2012 (R. 373, 377).

In February 2013, Dr. Dunmyer opined that Plaintiff could walk or stand less than one hour each in a work day and sit only 4 hours per day. She thought Plaintiff could lift or carry no more than ten pounds, could never climb ladders, and only occasionally could bend, kneel, squat, crawl, and climb stairs. She opined that Plaintiff is not able to reach above shoulder level. (R. 510-11.)

11

**C.      Treatment for Abdominal Pain at Genesis and Cleveland Clinic**

Following emergency room treatment for chronic abdominal pain, Plaintiff was admitted to Genesis from September 15 to 21, 2012 (R. 405-79), after which she was transferred to the Cleveland Clinic (R. 480-509). On January 2, 2012, she underwent a laparoscopic release of median arcuate ligament syndrome secondary to median acuate ligament syndrome. (R. 512-40.)

**D.      State Agency Evaluations**

On April 16, 2012, Dr. Mark E. Weaver, M.D. conducted a consultative examination. (R. 316-28.)  Plaintiff reported to Dr. Weaver that she uses a cane occasionally and has "constant dull achy pain and stiffness in her neck and lower back area with pain radiating from her neck into the shoulders and from the lower back into the right leg and up to the middle back area occasionally." She reported that "[t]his has limited many physical activities and she can only sit, stand or walk for about fifteen minutes at a time and lift and carry only about five pounds occasionally. This has also limited reaching and climbing activities." (R. 316.) Dr. Weaver noted that Plaintiff had a "stiffened gait and a right limp." (R. 317.)

Aside from excess adipose tissue, Plaintiff's limbs showed "no swelling, discoloration or gross deformities," and she had no asymmetric muscle atrophy or spasm. (R. 319.) Dr. Weaver noted:

> Strength testing in manual muscle testing . . . showed ratchety inconsistency with pain inhibition and giving way in the shoulder muscles secondary to neck area pain and in the proximal muscle groups of the right lower extremity secondary to lower back area pain, but strength testing was normal in the remaining muscle groups of the extremities today. Active and passive motions as measured by goniometer were restricted in both shoulders again secondary to neck pain inhibition, but were normal in all other major joints of the extremities today . . . There was no tenderness,

12

> crepitus, effusion or ligamentous laxity noted in any of the joints of
> the extremities today.

(R. 319.) Plaintiff's spine "showed flattening of the cervical lordotic curve and lumbar lordotic curve with a normal thoracic kyphotic curve without atrophy or gross scoliosis." (*Id.*) "There was a constant moderate involuntary spasm to inspection and palpation of the pracervical and paralumbar musculature with diffuse tenderness to palpation in the neck and lower back areas. Active motions by goniometer measure were restricted in the neck and dorsolumbar spine with pain inhibition." (*Id.*) Straight-leg raising was negative on the left leg at 90 degree elevation, but positive on the right leg at 50 degree elevation for radicular sciatica type pain complaints. He found "no organic radicular cervical, thoracic or lumbar nerve root impingement." (R. 320.)

> Dr. Weaver concluded that Plaintiff:

>> would probably be limited in the performance of physical activities
>> involving sustained sitting, standing, walking, reaching, climbing,
>> lifting and carrying, operating in environments containing
>> excessive chemical aerosols, temperature extremes or excessive
>> heat or humidity. She would probably be capable of performing
>> physical activities involving handling objects, speaking, hearing
>> and following directions.

(R. 320.)

In May 2012, state agency physician Gerald Klyop, M.D., reviewed the record and assessed Plaintiff's physical functioning capacity. He opined that Plaintiff could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight hour workday; and sit about six hours in an eight hour workday. (R. 87-88.) He opined that Plaintiff could occasionally climb ladders, ropes, or scaffolds; and could frequently stoop, kneel, crouch, and crawl. (R. 88.) She had limited abilities to reach in front and overhead with

both upper extremities (R. 88) and must avoid concentrated exposure to temperature extremes, humidity, fumes, odors, dust, gases, and poor ventilation (R. 89).

In August 2012, Dr. Michael Lehv, M.D. reviewed the record upon reconsideration and essentially affirmed Dr. Klyop's assessment. (R. 102-04.)

## IV.     THE ADMINISTRATIVE DECISION

The ALJ issued his decision on May 1, 2013. (R. 19-32.) She found that Plaintiff met the insured status requirements through December 31, 2016. (R. 25.) At step one of the sequential evaluation process,[3] the ALJ found that Plaintiff had not engaged in substantially gainful activity since her alleged onset date of July 7, 2011. (*Id.*)

At step two, the ALJ found that Plaintiff had the severe impairments of back disorders, including status-post surgeries of the cervical and lumbar spine, and asthma. (R. 25.) The ALJ found that Plaintiff has other medically determinable impairments which do not impose more

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 416.920(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can she perform her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can she perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

than minimal limitations in her ability to perform basic work activities, including abdominal and chest pain, depression, and anxiety. (R. 25-26.)

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically finding that Plaintiff did not meet the requirements of Listings 1.04 and 3.03. (R. 26-27.)

At step four of the sequential process, the ALJ evaluated Plaintiff's RFC as follows:

> [Plaintiff] has the residual functional capacity to lift/carry and push/pull up to twenty pounds occasionally and up to ten pounds frequently, stand/walk six hours in an eight-hour workday, and sit six hours in an eight-hour workday. She can occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can occasionally reach in front and overhead with both upper extremities. She must avoid temperature extremes, dust, fumes, gases, odors, and poor ventilation.

(R. 27.) To reach this determination, the ALJ considered the following evidence and made the following conclusions.

The ALJ noted that, "[i]n the prior disability decision," that ALJ found that Plaintiff "was limited to less than the full range of sedentary work." (R. 27 (citation omitted).) "However, . . . new and additional evidence, including medical records and employment history . . . demonstrate a capacity for work at the light exertional level." (R. 27-28.) The ALJ found that, while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible.

15

The ALJ indicated that Plaintiff's return to work between September and October 2011, following her previously-awarded closed period of disability, "showed her belief that she could return to work." (R. 29.) The ALJ acknowledges that Plaintiff "now alleges that her instincts were wrong, but medical records show improvement since her previous case." (R. 29.)

The ALJ first points out the following hospital records from Plaintiff's treatment for abdominal pain. (R. 29.) The physical exam notes from Genesis in September 2012 note: "Musculoskeletal: Normal range of motion. She exhibits no edema and no tenderness." (R. 438.) The physical exam notes from the Cleveland Clinic in October 2012 note: "Musculoskeletal: Denies significant problems. (R. 488.) Genesis emergency department notes from August 2002 also indicate that Plaintiff was able to ambulate well to the bathroom without assistance. (R. 457.) The ALJ concluded that "[t]hese facts suggest that [Plaintiff's] abilities to stand and walk have increased, and she is now capable of performing light work." (R. 29.)

The ALJ also found that Plaintiff's activities of daily living support the determined residual functional capacity, noting that Plaintiff "admitted to washing laundry, preparing meals, driving a vehicle, and shopping in stores for two hours at a time each week. These activities undermine her alleged limitations of lifting 10 pounds, standing for 5 minutes, and sitting for 60 minutes." (R. 29.)

The ALJ gave great weight to the state agency consultants' opinions that Plaintiff "can perform light work with postural and environmental limitations," finding their opinions to be "consistent with evidence that [Plaintiff's] musculoskeletal pain has decreased since her surgeries." (R. 29.)

The ALJ gave some weight to Dr. Weaver's opinion that Plaintiff "probably would be limited in the performance of physical activities involving sustained sitting, standing, walking, reaching, climbing, lifting, and carrying," but noted that Dr. Weaver's failure to provide duration-specific limitations for his restrictions made it difficult to apply his opinion to the residual functional capacity. (R. 29-30.)

The ALJ gave little weight to the February 2013 opinion of Plaintiff's treating primary care physician, Dr. Dunmyer, finding that it appeared to contradict evidence that Plaintiff's stenosis and pain improved following the surgery and the conclusion of her closed period. (R. 30.)

Relying on the VE's testimony, the ALJ determined that Plaintiff is able to perform her past relevant work as a data entry operator and general clerk. (R. 30-31.) Alternatively, relying on the VE's testimony, the ALJ determined that Plaintiff is capable of making a successful adjustment to other work that exists in significant numbers in the national economy, including an appointment clerk and a credit card clerk. (R. 31-32.) She therefore concluded that Plaintiff was not disabled under the Social Security Act. (R. 32.)

## V.    <u>STANDARD OF REVIEW</u>

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

17

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.    ANALYSIS

In her Statement of Errors, Plaintiff raises three issues. First, Plaintiff asserts that the ALJ failed to provide specific rationale for rejecting Plaintiff's testimony. (ECF No. 10 at 4-7.) Second, Plaintiff contends that the ALJ erred by failing to recontact the consultative physician

for clarification. (*Id.* at 7-8.) Third, Plaintiff asserts that the ALJ failed to accord adequate weight to the opinions of Plaintiff's treating physician. (*Id.* at 8-9.)

### A.     Rationale for Rejecting Plaintiff's Testimony

Plaintiff argues that the ALJ failed to provide specific rationale for rejecting Plaintiff's testimony regarding the intensity, persistence, and limiting effects of her symptoms. The Sixth Circuit has provided the following guidance in considering an ALJ's credibility assessment:

> Where the symptoms and not the underlying condition form the basis of the disability claim, a two-part analysis is used in evaluating complaints of disabling pain. 20 C.F.R. § 416.929(a); *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001); *Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994). First, the ALJ will ask whether the there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms. 20 C.F.R. § 416.929(a). Second, if the ALJ finds that such an impairment exists, then he must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities. *Id.*

*Rogers* v. Comm'r of Soc. Sec., 486 F.3d 234, 247 (6th Cir. 2007).

"The ALJ's assessment of credibility is entitled to great weight and deference, since he [or she] had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)). This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009)

(quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. Furthermore, the ALJ's decision on credibility must be "based on a consideration of the entire case record." *Rogers*, 486 F.3d at 247 (internal quotation marks omitted). An ALJ's explanation of his or her credibility decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248 (quoting SSR 96–7p, internal quotation marks omitted); *see also Mason v. Comm'r of Soc. Sec. Admin.*, No. 1:06–CV–1566, 2012 WL 669930, at *10 (N.D. Ohio Feb. 29, 2012) ("While the ALJ's credibility findings 'must be sufficiently specific', *Rogers*, 486 F.3d at 248, the intent behind this standard is to ensure meaningful appellate review.").

"Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. In addition, the Regulations list a variety of factors an ALJ must consider in evaluating the severity of symptoms, including a claimant's daily activities, the effectiveness of medication, and treatment other than medication. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p, 1996 WL 374186 (July 2, 1996); *but see Ewing v. Astrue*, No. 1:10–cv–1792, 2011 WL 3843692, at *9 (N.D. Ohio Aug. 12, 2011) (suggesting that although an ALJ is required to consider such factors, he or she is not required to discuss every factor within the written decision) (Report and Recommendation later adopted).

Here, as stated above, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, Plaintiff objects to the

20

ALJ's credibility finding regarding her statements concerning the intensity, persistence, and limiting effects of those symptoms; arguing that the ALJ cherry-picked evidence to support her conclusion.

First, Plaintiff complains that the ALJ first cited Plaintiff's "attempt to return to work as proof that she could in fact work." (ECF No. 10 at 6.)

Plaintiff argues that the cited evidence contained in hospital treatment records pertaining to Plaintiff's abdominal pain "is not a good assessment of [her] ongoing chronic pain due to her back impairments." (ECF No. 10 at 6.)

Plaintiff asserts that, when considering Plaintiff's daily activities, the ALJ ignored Plaintiff's testimony that light housework takes her all day due to frequent breaks. Plaintiff also implies that her two-hour shopping trips are consistent with her report (R. 215) that she cannot walk more than 50 feet at a time between five minute rests. (ECF No. 10 at 6.)

Finally, Plaintiff argues that the ALJ improperly weighed Plaintiff's request for a closed period of disability in her prior claim as well as her attempt to return to work, both of which Plaintiff argues "clearly demonstrated a desire early on to return to work." She states that "[t]he ALJ ignored the fact that this evidence of the record only bolstered the Plaintiff's credibility rather than detract[ed] from it." (ECF No. 10 at 7.)

The Commissioner responds that substantial evidence supports the ALJ's determination that Plaintiff was not entirely credible. The Commissioner states that "diagnostic testing showed that Plaintiff suffered only mild physical limitations." (ECF No. 13 at 16-17.) The Commissioner points to the June 2012 MRI, which was stable compared to the 2010 MRI except that "[a]nterolisthesis at L4 on L5 is slightly more conspicuous," and "[c]entral canal and lateral

21

recess stenosis has improved." (R. 381-82.) The Commissioner also points out Dr. Shannon's treatment notes dated October 8, 2013 stating that an MRI showed "mild stenosis with no cord compression at C3-4"; Dr. Shannon's impressions included mild cervical stenosis with degenerative disc C3-4 and cervicalgia. (R. 541.)

The Commissioner argues that physical examinations also showed only mild abnormal findings, which also undermined Plaintiff's credibility. For example, at an exam in December 2011, Plaintiff complained of back pain, but Dr. Shannon's findings were: "right paraspinal muscle spasm, good strength, sensation and reflexes and she is able to walk to heels and toes." (R. 275.) In June 2012, Dr. Shannon again noted good strength and sensation, although he also noted that "her patellar reflexes are absent, [and] she has limited flexion to only about 10 degrees." (R. 380.)

In addition to the other hospital records discussed above, pertaining to Plaintiff's abdominal issues, the Commissioner points out that it was noted in October 2012 that Plaintiff's "[s]pine range of motion [was] normal," her "[m]uscular strength [was] intact," and she had normal extremities and a normal gait. (R. 489.)

In October 2013, Dr. Shannon reported to Dr. Dunmeyer that there was only "a little tenderness in [Plaintiff's] neck and there is no paraspinal muscle spasm, fairly good range of motion but she has good strength, sensation and reflexes." (R. 541.)

During her consultative examination with Dr. Weaver in April 2012, Plaintiff "showed ratchety inconsistency with pain inhibition and giving way in the shoulder muscles secondary to neck area pain and in the proximal muscle groups of the right lower extremity secondary to lower back area pain, but strength testing was normal in the remaining muscle groups of the

22

extremities." (R. 319.) The Commissioner argues that these findings suggest that Plaintiff may not be putting forth full effort at her evaluation. (ECF No. 13 at 18.)

As stated above, the ALJ's credibility assessment receives great weight and deference, but must be supported by substantial evidence and explained with sufficient specificity to make clear the weight given to Plaintiff's statements and the reasons for that weight. Here, the ALJ concluded that Plaintiff's three months of work and her admitted daily activities contradicted her reported symptoms. The ALJ also found apparent contradictions between the medical records and the reported intensity, persistence, and limiting effects of Plaintiff's symptoms. With the exception of January 2014, and the surgery the following month (R. 9, 10), the undersigned finds that the results of Plaintiff's diagnostic testing and physical examinations provide substantial evidence to support the ALJ's finding that her pain had improved and her limitations were less severe than she claimed. Because the ALJ found contradictions between the medical reports and Plaintiff's testimony, "[d]iscounting credibility to a certain degree is appropriate." *Walters*, 127 F.3d at 531. Given the deference this Court must afford the ALJ's credibility assessment, together with the assessment that substantial evidence supports her conclusions, the undersigned therefore **RECOMMENDS** that this objection be **OVERRULED**.

## B. Failure to Recontact the Consultative Physician

Plaintiff contends that the ALJ erred by failing to recontact Drs. Weaver and Dunmeyer for clarification. (ECF No. 10 at 7-8.) The ALJ gave Dr. Dunmeyer's opinion "little weight" because she found that it "appears to contradict the evidence." (R. 30.) The ALJ gave only "some weight" to Dr. Weaver's opinion because Dr. Weaver failed to provide duration-specific

limitations for his restrictions, making it difficult to apply his opinion to the residual functional capacity. (R. 29-30, 320.)

Plaintiff acknowledges in her reply brief that she initially cited an outdated regulation. (ECF No. 14 at 4.) She maintains, however, that the current regulation, 20 C.F.R. § 404.1520b, still required the ALJ to recontact the physicians. That section provides:

> If the evidence is consistent but we have insufficient evidence to determine whether you are disabled, or if after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency. The action(s) we take will depend on the nature of the inconsistency or insufficiency. We will try to resolve the inconsistency or insufficiency by taking any one or more of the actions listed in paragraphs (c)(1) through (c)(4) of this section. . . .
>
> > (1) We may recontact your treating physician . . . or other medical source. We may choose not to seek additional evidence or clarification from a medical source if we know from experience that the source either cannot or will not provide the necessary evidence. . . .;
> >
> > (2) We may request additional existing records . . .;
> >
> > (3) We may ask you to undergo a consultative examination . . .; or
> >
> > (4) We may ask you or others for more information.

20 C.F.R. § 404.1520b.

Plaintiff argues that there was insufficient or conflicted evidence, requiring the ALJ to recontact Drs. Weaver and Dunmeyer, and suggests that the ALJ's discretion is limited to cases in which the "medical source . . . cannot or will not provide the necessary evidence." (ECF No. 14 at 4-5.) The undersigned agrees with the Commissioner, however, that the plain language of the regulation does not require the ALJ to re-contact a physician. *See Young v. Comm'r of Soc.*

24

*Sec.*, No. 1:13-CV-500, 2014 WL 3687745, at *6 (S.D. Ohio July 24, 2014) (noting that regulation is permissive and therefore ALJ not required to re-contact a medical source). The undersigned therefore **RECOMMENDS** that this objection be **OVERRULED**.

### C.    Weight of Treating Physician Opinion

Plaintiff argues that the ALJ failed to provide good reasons for assigning less than controlling weight to Dr. Dunmyer's treating opinion. She therefore maintains that the ALJ's decision is not supported by substantial evidence.

The ALJ must consider all medical opinions that he receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

26

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx. 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Plaintiff asserts that the ALJ failed to provide good reasons for assigning less than controlling weight to Dr. Dunmyer's opinion. She notes that the ALJ simply concluded that Dr. Dunmyer's opinion, provided in February 2013, "appears to contradict evidence that [Plaintiff's] stenosis and pain improved following the surgery and the conclusion of her closed period." (R. 30.)

Citing the same evidence discussed in Part VI(A), above, the Commissioner argues that Dr. Dunmyer's opinion was inconsistent with the medical evidence as a whole and was not supported by objective evidence or clinical observation. (ECF No. 13 at 8-10.)

27

While the ALJ acknowledged that Dr. Dunmyer was Plaintiff's treating physician, she did not acknowledge her obligation to provide the reasons for failing to afford the doctor's opinion controlling weight. She simply stated that the opinion "appears to contradict evidence" that Plaintiff's stenosis and pain improved after surgery.  (R. 30.)  To the extent the ALJ found Dr. Dunmyer's opinion inconsistent with other substantial evidence in the record, she failed to specify which findings she considered to be inconsistent. This reason, nonetheless, is not supported by substantial evidence.

Dr. Dunmyer opined that Plaintiff could walk or stand less than one hour and sit only 4 hours per day; could lift or carry no more than ten pounds; could only occasionally could bend, kneel, squat, crawl, and climb stairs; and could not reach above shoulder level.  (R. 510-11.) While some medical evidence can be construed as inconsistent with Dr. Dunmyer's opinion, the record contains only two directly comparable opinions.[4]  First, agency physician Dr. Weaver, who examined Plaintiff, opined that she "would probably be limited in the performance of physical activities involving sustained sitting, standing, walking, reaching, climbing, lifting and carrying." (R. 320.) Second, agency physician Dr. Klyop, based on a review of the record, opined that Plaintiff could lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight hour workday; and sit about six hours in an eight hour workday. (R. 87-88.)

The undersigned finds that, while Dr. Weaver's opinion fails to provide duration-specific limitations, his use of the word "sustained" suggests that the durations would likely be less than

---

[4] The Court notes that Plaintiff reported her own limitations to be much more severe than opined by Dr. Dunmyer. (R. 49, 316.)

those provided by Dr. Klyop. However, rather than explaining how she reconciled the difference in the opinions of Drs. Dunmyer, Weaver, and Klyop, the ALJ appears to have adopted wholesale the opinion of Dr. Klyop, whose opinion was the furthest from Plaintiff's reported symptoms and Dr. Dunmyer's treating opinion. (*See* R. 27.)

The Undersigned therefore cannot conclude that substantial evidence supports the weight assigned to Dr. Dunmyer's opinion and the ALJ's ultimate nondisability finding.  Further, the ALJ's violation of the treating source rule was not harmless error. See *Wilson*, 378 F.3d at 547 (finding harmless error where the treating source's opinion was patently deficient, where the ALJ's decision was consistent with the treating source's opinion, or where the ALJ's decision met the goal of *Wilson*'s good reason requirement).

On remand, proper analysis of the entire record might not support giving controlling weight to the opinion of Dr. Dunmyer. Even if her opinion is not entitled to controlling weight, it must still be weighed in accordance with the prescribed regulations. *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 380 (6th Cir. 2013). Given the nature of her treatment relationship with Plaintiff, her detailed treatment notes, and the supportability and consistency of her opinions with the record evidence, any subsequent ALJ must provide a clear explanation, supported by substantial evidence, for the weight assigned to Dr. Dunmyer's opinion.

**VII.   CONCLUSION**

Due to the error outlined above, Plaintiff is entitled to an order remanding this case to the Social Security Administration pursuant to Sentence Four of 42 U.S.C. § 405(g).  It is therefore **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-

29

disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g) for further consideration consistent with this Report and Recommendation.

## VIII.  <u>PROCEDURE ON OBJECTIONS</u>

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b). The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Dated:  August 17, 2015                                /s/ *Elizabeth A. Preston Deavers*
                                                       Elizabeth A. Preston Deavers
                                                       United States Magistrate Judge